UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
GINO DINUCCI,

                  Plaintiff,

         - against -

WILLIAM J. CLIFFORD,

                  Defendant.
----------------------------------------------------------X

FILED
CLERK

10:00 am, Jun 06, 2023

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**MEMORANDUM
AND ORDER**

Civil Action
No. 21-2292 (GRB)(LGD)

**GARY R. BROWN, United States District Judge**:

      The illustrious *Oxford English Dictionary* defines that vulgar though common idiom "sh*t happens" as denoting the unpleasant truth that "bad things often happen unavoidably" and "expressing a resigned attitude [that] these things happen, such is life." *Sh*t*, Oxford English Dictionary (3d ed. 2011), https://www.oed.com/view/Entry/178328. One can easily understand plaintiff's resort to this expression to describe the occurrence that led to this case.[1]

*Factual Background*

      The facts, viewed in light most favorable to plaintiff, are undisputed except where otherwise stated and are as follows. This case involves a personal injury arising out of a unique activity: hand propping[2] a vintage 1930 Brunner-Winkle Bird aircraft (the "Bird"). Plaintiff Gino DiNucci ("plaintiff") and defendant William J. Clifford ("defendant") are antique aircraft enthusiasts and hobbyists, each of whom owns several vintage aircraft. Docket Entry ("DE") 25-4 ¶ 45; DE 25-1, Ex. 1 at 7:9-13; DE 25-1, Ex. 2 at 40:3-7.

---

[1] Docket Entry 25-1, Ex. 6 at 7.
[2] Hand propping is the process by which an individual starts an airplane by hand, commonly required for vintage aircraft. *See* U.S. Dep't of Transp., Fed. Aviation Admin., FAA-H-8083-3C, Airplane Flying Handbook at 2-17 (2021). To start the engine, one person (the hand propper) places his palms on the blade of the airplane's propellor and pushes the blade downward rapidly, stepping back and away from the propellor as the momentum of the propellor starts the engine. *Id.* A second person (the pilot) remains in the cockpit of the airplane communicating with the hand propper while controlling the airplane's brakes and throttle. *Id.*

1



*Hand Propping a Brunner-Winkle Bird*

Though described as a hobbyist and enthusiast, plaintiff is no amateur. He has extraordinary experience in maintaining and repairing aircraft. While serving approximately six years in the United States Army, plaintiff attended helicopter and aircraft maintenance schools, spending 50% of his time performing aircraft maintenance on "[e]verything the army had." DE 25-1, Ex. 2 at 10-12. Outside of the Army, plaintiff earned multiple aviation certifications including private pilot, commercial pilot, instrument pilot, instrument instructor, flight instructor, seaplane instructor, and inspection authorization. DE 25-4 ¶ 12. Plaintiff also worked for Trans World Airlines as an aircraft mechanic for 10 years and then as a crew chief for over 25 years. *Id.* ¶ 17.

All the while, plaintiff performed aircraft maintenance as a sideline, sometimes for compensation but "[t]oo many times" for free. DE 25-1, Ex. 2 at 20:6-12. To maintain good standing with his inspector authorization certificate, plaintiff performed at least ten inspections per year on individual aircraft. DE 25-4 ¶¶ 22-23.

2

The parties met at the Bayport Aerodrome[3] approximately thirty years ago. *Id.* ¶ 25. Soon after, plaintiff began performing inspections and maintenance on defendant's vintage aircraft, including the Bird. *Id.* ¶ 27. At the time, the Bird had a Kinner K-5 engine and air starter system, which allowed the Bird to be started without hand propping. DE 25-1, Ex. 1 at 20:11-15. In spring 2002, plaintiff helped defendant install a new Kinner R-55 engine in the aircraft. DE 25-4 ¶ 29; DE 25-1, Ex. 4 at 7. While a starter system could have been installed with the new engine, defendant testified that he spent years searching for a compatible electric starter but had difficulty obtaining one because "[a]ny time you find one, it's already sold." DE 25-1, Ex. 1 at 23-24. So, since 2002, the Bird has lacked a starter system and has needed to be hand propped. *Id.* at 21:18-21; DE 25-7 ¶ 9.

Like his experience in maintaining aircraft, plaintiff is no stranger to hand propping vintage airplanes. In fact, with respect to hand propping, plaintiff advises that he is the "guy who teaches them how to do it" and that he has "shown them all how to do it." DE 25-4 ¶ 37. Plaintiff's own fleet included a vintage 1946 Piper J-3 aircraft, which plaintiff hand propped himself approximately 500 times before its restoration in 2018. *Id.* ¶ 15.

Plaintiff also has considerable experience hand propping the Bird. Proclaiming to be "the more experienced hand propper [of the Bird]," plaintiff hyperbolizes that he has hand propped it—with its new engine—"a million times," though his actual estimate is "[p]robably 100." DE 25-5 ¶¶ 33-35. Plaintiff felt "comfortable hand-propping the 'Bird' aircraft with [defendant] in the cockpit." *Id.* ¶ 35. And plaintiff has only ever hand propped the Bird for recreational purposes and has neither sought nor received compensation for doing so. *Id.* ¶¶ 46, 47.

---

[3] Bayport Aerodrome is a grass field airport in Bayport, New York that stores antique aircraft and is used solely for recreational flying. DE 25-4 ¶¶ 42, 44.

3

As someone who has been "[hand] propping for a long time," plaintiff does not dispute that he was well aware of the risks involved. *See* DE 25-1, Ex. 2 at 35:9-10. When asked if he was aware of the risk of injury poised by hand propping the Bird, plaintiff testified "[w]e're always aware of it. That's why we take the precautions that we do." *Id.* at 114:3-8. Plaintiff also alleged in his second amended complaint that "[h]and propping aircraft is an inherently risky activity and, according to the Federal Aviation Administration, is 'extremely dangerous if even all goes as planned.'" DE 25-4 ¶ 40; DE 18 ¶ 18. To be sure, plaintiff admitted that "[a]t the time of the accident, [he] was aware of the risk of injury posed by hand-propping aircraft and the risk of injury posed by hand-propping the 'Bird' aircraft." DE 25-4 ¶ 38.

On September 16, 2018, the parties were at the Bayport Aerodrome attending the annual neighborhood appreciation picnic ("Neighbor's Day"), during which members of the local community would come together to tour and fly in vintage aircraft. *Id.* ¶ 48. To take part in the Neighbor's Day festivities, defendant took the Bird out for a few flights, each time being hand propped by individuals other than plaintiff and all without incident. *Id.* ¶ 2; DE 25-1 at 37:6-20. Defendant did not ask plaintiff to hand prop the Bird that day. DE 25-4 ¶ 4.

Preparing for another flight, defendant arranged for a man named Nick to hand prop the Bird. DE 25-1, Ex. 2 at 9:18-19. But when Nick stood ready at the Bird's propellor, plaintiff— without any communication with defendant—stepped in and told Nick that he would hand prop the Bird instead. DE 25-4 ¶¶ 3, 4. Nick moved out of the way, and plaintiff readied himself at the propellor. *See id.* Plaintiff grabbed the Bird's propellor and pulled down, starting the engine "as expected." DE 25-4 ¶ 7. But for some unknown reason, the propellor allegedly "sort of slowed down" before firing again, striking and nearly severing plaintiff's arm before he was able to move out of the way. DE 25-1, Ex. 2 at 72:19-24, 78:3-32. Defendant heard the propellor hit plaintiff's

4

arm and immediately shut down the Bird.  DE 25-4 ¶ 7.  Plaintiff was taken to the hospital and treated for his injuries.  DE 25-1 at 80:4-6.

While the exact cause of the propellor to allegedly "slow down" is unknown, the Bird appears to have been in good working condition at the time of the accident.  Plaintiff believes that the Bird was in airworthy condition on the day of the accident and even conducted the most recent inspection of the Bird prior to the accident.  DE 25-4 ¶¶ 27, 31.  Additionally, the FAA has not issued any "Airworthiness Directive" concerning the Bird aircraft or its engine.  *Id.* ¶ 28.  Nevertheless, this suit followed.

*Procedural History*

Plaintiff commenced this action against defendant on April 26, 2021, alleging three causes of action in his second amended complaint: (1) negligence, (2) strict liability, and (3) violation of New York General Business Law § 251.  After the close of discovery, defendant requested a pre-motion conference seeking leave to file a motion for summary judgment.  On July 1, 2022, the Court held a pre-motion conference and set a briefing schedule for defendant's motion for summary judgment.  On September 29, 2022, defendant filed his motion for summary judgment, plaintiff's opposition, defendant's reply thereto, and all accompanying Rule 56.1 statements, declarations, and exhibits.  This opinion follows.

**Discussion**

*Standard of Review*

This motion for summary judgment is decided under the oft-repeated and well understood standard for review of such matters, as discussed in *Bartels v. Inc. Vill. of Lloyd Harbor*, 97 F. Supp. 3d 198, 211 (E.D.N.Y. 2015), *aff'd sub nom. Bartels v. Schwarz*, 643 Fed. App'x. 54 (2d Cir. 2016), which discussion is incorporated by reference herein.

*Preemption by the Federal Aviation Act*

The Court must first determine what effect, if any, the Federal Aviation Act of 1958, 49 U.S.C. § 40101, *et seq.* (the "FAA") has on plaintiff's claims. Under the Supremacy Clause of the Constitution, state and local laws that conflict with federal law are "without effect." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). There is, however, an "assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). So, the key inquiry of a preemption analysis is to determine the intent of Congress, who may indicate preemptive intent expressly through a statute's language or implicitly through its structure and purpose. *Id.* (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)).

Analyzing a statute's structure and purpose, Congress may indicate preemptive intent through "field preemption," which exists where "Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law." *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 351 (2d Cir. 2008). In determining whether a federal law has field-preemptive effect, a district court must determine (1) that Congress possessed the "intent to preempt," and (2) what "the scope of that preemption" is. *Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 211 (2d Cir. 2011).

As to the first prong, it is well-established that "Congress intended to occupy the field of air safety" by enacting the FAA. *See id.* at 210; *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 224–25 (2d Cir. 2008) (per curiam). The Second Circuit has succinctly addressed the point:

> The FAA was enacted to create a "uniform and exclusive system of federal regulation" in the field of air safety. *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 639, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973). Shortly after it became law, we noted that the FAA "was passed by Congress for the purpose of

6

>centralizing in a single authority—indeed, in one administrator—the power to frame rules for the safe and efficient use of the nation's airspace." *Air Line Pilots Ass'n, Int'l v. Quesada,* 276 F.2d 892, 894 (2d Cir.1960); *see also British Airways Bd. v. Port Auth. of N.Y. & N.J.,* 558 F.2d 75, 83 (2d Cir.1977) ("[The FAA] requires that exclusive control of airspace management be concentrated at the national level."). Congress and the Federal Aviation Administration have used this authority to enact rules addressing virtually all areas of air safety.

*Air Transp. Ass'n of Am., Inc.*, 520 F.3d at 224. Thus, Congress has expressed an intent to occupy the entire field of air safety, and the first prong of field-preemption has been satisfied.

Turning to the second prong, courts in this circuit have held that the scope of the FAA's preemption extends to the standards of care applicable in air safety cases. *See Shupert v. Cont'l Airlines, Inc.*, No. 00 CIV. 2743 (LMM), 2004 WL 784859, at *6 (S.D.N.Y. Apr. 12, 2004) (holding that the standard of care covering air safety is governed by the FAA); *In re Air Crash Near Clarence Ctr., New York, on Feb. 12, 2009*, 798 F. Supp. 2d 481, 486 (W.D.N.Y. 2011) (same); *Aldana v. Air E. Airways, Inc.*, 477 F. Supp. 2d 489, 493 (D. Conn. 2007) (same). Courts reason that the FAA and its corresponding regulations have created an "overarching general standard of care" with the enactment of 14 C.F.R. § 91.13, which provides, in pertinent part, that "[n]o person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another." *See Shupert*, 2004 WL 784859, at *6.

The scope of the FAA's preemption, however, does not apply to all state law tort actions but rather only such actions that concern the "design or operation" of aircraft. *See Air Transp. Ass'n of Am., Inc.*, 520 F.3d at 225 (citation omitted); *Spinard v. Comair, Inc.*, 825 F. Supp. 2d 397, 412 (E.D.N.Y. 2011) (holding that the plaintiff's state law negligence claim alleging failure to provide sufficient personnel to assist travelers exiting airplane not governed by the FAA because claim was "not an air-safety" case concerning the "design or operation of the aircraft"). Therefore, the FAA preempts state law standards of care that concern the "design or operation" of aircraft.

7

The extent of preemption turns on the type of claim being preempted. For negligence claims, courts simply replace the standard of care prescribed by the state with that propounded by the FAA, leaving the remaining elements unaffected. *See, e.g.*, *Shupert*, 2004 WL 784859, at *6. But courts have held that strict liability claims are preempted in their entirety. *See McAllister v. Catalyst Aviation, LLC*, No. 19-CV-642 (BKS)(DJS), 2020 WL 13200026, at *4 (N.D.N.Y. Dec. 22, 2020) (finding that the plaintiff's state law labor law claims, which imposes a form of strict liability were entirely preempted by the FAA); *Jones v. Goodrich Corp.*, 422 F. Supp. 3d 518, 525 (D. Conn. 2019) (plaintiff's state law claim of strict liability preempted by the FAA in its entirety).

Here, plaintiff's negligence and strict liability claims fall squarely within the scope of the FAA as both arise out of the "design and operation" of aircraft. Concerning the "design" of the Bird, plaintiff argues that defendant intentionally failed to install an electric starter with its new engine, requiring it to be hand propped. And regarding the "operation" of the Bird, plaintiff contends hand propping the Bird recklessly caused him serious harm. By plaintiff's own definitions, this constitutes an air-safety case concerning the "design or operation" of aircraft. Therefore, the Court finds that plaintiff's negligence claim is preempted to the extent that the FAA governs the applicable standard of care and finds that plaintiff's strict liability claim is preempted in its entirety.[4]

Such a result is consistent with the overall structure and purpose of the FAA because any standard of care that differs from the "careless or reckless" standard outlined in the FAA would "interfere with congressional intent for centralized control in the aviation field." *McAllister*, 2020 WL 13200026, at *4 (cleaned up). Indeed, had Congress intended to impose strict liability on

---

[4] Plaintiff acknowledges that New York state law standards for strict liability would be "contrary to Federal preemption principles." *See* DE 25-5 at 9, 12.

8

aircraft operators in this context, it could have expressly done so. *See, e.g.*, *United States v. Gutierrez*, 624 F. Supp. 759, 762 (E.D.N.Y. 1985) (acknowledging that certain FAA regulations, such as possession of a firearm at an airport, impose strict liability).

*Negligence*

To prevail on a negligence claim, a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom. *Pasternack v. Lab'y Corp. of Am. Holdings*, 27 N.Y.3d 817, 825 (2016); *Union Mut. Fire Ins. Co. v. Ace Caribbean Mkt.*, 64 F.4th 441 (2d Cir. 2023). Failure to establish all three elements proves fatal to a negligence claim. *See Ace Caribbean Mkt.*, 64 F.4th 441 (affirming the district court's order granting summary judgment where the plaintiff failed to establish the third element of negligence).

The parameters of that duty, though, derive from the FAA, which provides that "[n]o person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of others." 14 C.F.R. § 91.13(a). The question then becomes whether, based upon the undisputed facts, defendant breached that duty, or whether facts remain in dispute on that question. The answer is clear.

As a factual matter, plaintiff has conceded that defendant did not breach this duty. In a recorded interview with Robert Porter, a representative from defendant's insurance company, plaintiff was asked, "is there anything that you know that Mr. Clifford could've done differently that would've prevented [the accident]?" DE 25-2, Ex. 6 at 7. Plaintiff responded, "No." *Id.* Mr. Porter then asked, "is there anything that you can think of that Mr. Clifford did that might've contributed to [the accident]?" *Id.* Plaintiff again responded, "No." *Id.* Plaintiff confirmed these statements under oath at his deposition. DE 25-1, Ex. 2 at 75-76. Moreover, plaintiff admitted

9

these statements in his response to defendant's Rule 56.1 Statement. DE 25-6 ¶ 36; *see also* DE 25-6 ¶ 32 (admitting that "[plaintiff] believes that Defendant William Clifford safely operated the 'Bird' aircraft on September 16, 2018, the day of the accident."). Therefore, there appears to be no undisputed issues of fact that would permit plaintiff to establish a breach of duty under the lesser, preempted duty of care under state law.

The real question, though, is whether plaintiff can establish recklessness under the FAA's heightened standard of care. Plaintiff's counsel argues that because defendant installed a new, more powerful engine in the Bird but did not install an electric starter, requiring the Bird to be hand propped, such conduct was intentional, and as such, "reckless" because it potentially exposed plaintiff to harm.[5] *Id.* ¶ 11; DE 25-5 at 6.

The FAA and the regulations promulgated thereunder lack clear guidance as to "reckless" as used in § 91.13. *See generally* 49 U.S.C.A. § 40102 (West 2018); 14 C.F.R. § 1.1 (West 2021). Some courts, however, have recognized that violations of § 91.13(a) should be reserved only for "egregious misconduct where the potential for harm is incontestably high" and for "serious, more flagrant pilot misconduct." *See Allen v. Am. Airlines, Inc.*, 301 F. Supp. 2d 370, 376–77 (E.D. Pa. 2003) (collecting cases); *See, e.g., Johnson v. Nat'l Transp. Safety Bd.*, 979 F.2d 618 (7th Cir. 1992) (upholding § 91.13(a) suspension where a pilot allowed his co-pilot to operate an airplane while under the influence of alcohol). In *Allen*, the court held that the defendant airline's alleged misconduct of overpacking overhead luggage compartments, which purportedly allowed a laptop stored in the compartment to fall and injure the plaintiff, did not "equate[ ] or even approach[ ] the

---

[5] Plaintiff does not allege in his opposition to defendant's motion for summary judgment that defendant acted "carelessly" under the FAA, so the Court need not address this point. *See Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004) (holding that plaintiffs' arguments that were not raised in their opposition to summary judgment are waived).

10

grave, highly endangering actions previously found to have breached § 91.13(a)." *Allen*, 301 F. Supp. 2d at 378.

Plaintiff invokes a National Transportation Safety Board ("NTSB") decision, *Jane F. Garvey, Administrator, Federal Aviation Administration v. Leonard P. Miller*, Opinion and Order, Docket SE-14785 (hereinafter "NTSB Decision"). There, the NTSB affirmed the FAA's finding that pilot Leonard Miller acted recklessly under § 91.13(a) when he left his twin-engine aircraft unmanned with the engine running and propellors spinning while parked on a slightly sloping ramp without chocking the tires. NTSB Decision at 2-3. The NTSB reasoned that "[l]eaving the area of the aircraft when its engines are running and the props turning is inherently dangerous" and Miller increased "the possibility of uncontrolled movement" by stopping the aircraft on a slightly sloping ramp without chocking it. *Id.* at 2. This hardly seems analogous to the undisputed facts here.

The parties also cite to the FAA Airplane Flying Handbook, which discusses hand propping in detail. *See generally* U.S. DEP'T OF TRANSP., FED. AVIATION ADMIN., FAA-H-8083-3C, AIRPLANE FLYING HANDBOOK (2021) (hereinafter "FAA Handbook"). Notably, the FAA Handbook acknowledges that while most airplanes today are equipped with electric starters, "vintage airplanes may be encountered, and an airplane manufactured without an electric starter needs to be hand propped." *Id.* at 2-16. And since "a number of" such vintage aircraft exist, the FAA Handbook establishes procedures for hand propping, and also cautions individuals as to the risks involved. *Id.* at 2-16 to -17. The FAA Handbook does not, in any way, characterize hand propping as "reckless" conduct, and its inclusion of procedures for hand propping undermines the suggestion that the activity is inherently reckless. *See generally id.*

11

With these principles in mind, plaintiff's arguments fall far short of establishing that a genuine issue of material fact exists as to whether defendant acted recklessly under § 91.13(a). While plaintiff makes much of the fact that defendant upgraded the Bird's engine, the crux of plaintiff's argument is that defendant was reckless because the Bird needed to be hand propped, which exposed plaintiff to potential harm. But by plaintiff's own logic, any aircraft owner who flies vintage aircraft needing to be hand propped would be acting "recklessly" under § 91.13(a), which, somewhat ironically, would also include plaintiff, whose vintage 1946 Piper J-3 aircraft required hand propping.

In any event, plaintiff relies solely on the NTSB Decision, which plaintiff contends stands for the proposition that "[p]owered, spinning propellor blades endanger the life and property of others . . . [and] *is* reckless conduct according to both the FAA and NTSB." DE 25-5 at 6. But plaintiff mischaracterizes the NTSB Decision in both principle and fact. First, the NTSB Decision does not establish that the existence of spinning propellor blades alone rises to the level of reckless. Rather, the existence of spinning propellor blades will rise to recklessness if the aircraft is also left unmanned on a sloping ramp, and without chocking around the tires. *See* NTSB Decision at 2. And second, unlike the pilot in the NTSB Decision, defendant here did not leave the Bird unmanned, running with the propellors rotating, and without tire chocking. Thus, plaintiff has failed to show that defendant's conduct rises to the level of recklessness present in the NTSB decision.

Likewise, plaintiff cannot establish that defendant acted recklessly under the exacting standards set out in *Allen*. Defendant, with the assistance of plaintiff, installed a new engine in the Bird for improved "reliability." DE 25-1, Ex. 1 at 21:11-14. Although the Bird could have hypothetically received an electric starter, plaintiff has not shown that defendant was under any

12

obligation to install one. Indeed, the Bird became no different than countless other vintage aircraft requiring hand propping. And there has not been an Airworthiness Directive issued by the FAA with respect to the Bird concerning the engine, either before or after the accident. *Id.* ¶ 28. As such, the Court declines to find that merely because an individual is posed to danger when hand propping, which is often necessary for vintage aircraft, such conduct rises to the level of "grave, highly endangering actions" outlined in *Allen* and other courts.

Nor can plaintiff show that defendant's conduct was reckless under the FAA Handbook. While acknowledging the dangers of hand propping, the FAA Handbook also recognizes the common need to hand prop vintage aircraft and, as such, provides guidance to educate participants. Throughout the entire the FAA Handbook, there lacks any inference that hand propping aircraft is reckless conduct.

Nevertheless, plaintiff argues that the Court should equate defendant's failure to install an electric starter—something that he was under no obligation to do—with "cut[ting] the seatbelts out of and/or disabl[ing] the brakes of his personal car and invit[ing] Plaintiff to go for a ride." DE 25-5 at 6. The Court need not address in detail the obvious distinctions between entirely legal activity, such as defendant's, and hypothetical criminal conduct as imagined by plaintiff.[6]

Therefore, the Court finds that plaintiff has failed to show that a genuine issue of material fact exists as to whether defendant breached his duty and, as such, has failed to establish a *prima facie* claim of negligence.[7]

---

[6] *See* N.Y. VEH. & TRAF. LAW § 375 (McKinney 2022) (requiring that every motor vehicle shall be provided with adequate brakes at all times when in use and violation of the same shall constitute a misdemeanor); N.Y. VEH. & TRAF. LAW § 1229-c (McKinney 2022) (requiring all passengers in a motor vehicle to be restrained by a safety belt, punishable by civil fine).

[7] Plaintiff has equally failed to establish that defendant violated a "specific industry standard" when he installed a new engine in the Bird without an electric starter. *See Minho Hahn v. Town of W. Haverstraw, NY*, 563 F. App'x 75, 77 (2d Cir. 2014) (summary order) (affirming an award of summary judgment where the plaintiff's expert report failed to articulate how defendant's conduct violated "a specific industry standard"); *Lombardo v. Cedar Brook Golf &*

13

*Assumption of Risk Doctrine*

Even assuming, *arguendo*, that plaintiff could establish a *prima facie* case of negligence or strict liability under New York law, defendant would still be entitled to judgment as a matter of law based on the assumption of risk doctrine.

Generally, assumption of risk is not an absolute defense to a negligence action under New York law.  *See* N.Y. C.P.L.R. § 1411 (establishing that in a personal injury action, the culpable conduct attributable to the claimant, including assumption of risk, shall not bar recovery but will diminish the damages otherwise recoverable); *Arbegast v. Board of Educ. of S. New Berlin Cent. Sch.,* 65 N.Y.2d 161, 165–70 (1985) (discussing New York law before and after enactment of C.P.L.R. § 1411).  There is an exception, however, where a personal injury claim is "*barred as a matter of law*" if it arises from participation in a sport or recreational activity and there is no evidence of reckless or intentional conduct.  *Goodlett v. Kalishek*, 223 F.3d 32, 36 (2d Cir. 2000) (citing *Turcotte v. Fell* 68 N.Y.2d 432 (1986)).  The New York Court of Appeals reasoned that by electing to participate in such an activity, an individual consents to those "injury-causing events which are known, apparent, or reasonably foreseeable consequences of the participation."  *Id.* (quoting *Turcotte*, 68 N.Y.2d at 439).

For an individual to consent to the risks inherent in a sport or recreational activity, the participant must be aware of the risk, has an appreciation of the nature of the risk, and voluntarily assumes the risk.  *Kevin Grady v. Chenango Valley Cent. Sch. Dist. et al., Joanne Secky, &c.*, No. 23, 2023 WL 3102723, at *2 (N.Y. Apr. 27, 2023) (cleaned up).  It is "not necessary that the injured participant foresaw the exact manner in which his injury occurred, so long as he or she is aware of the potential for injury of the mechanism for which the injury results."  *Id.* (quoting

---

*Tennis Club, Inc.,* 39 A.D.3d 818 (2d Dep't 2007) (granting summary judgment where plaintiff's expert did not identify "any specific industry standard upon which he relied in concluding that the defendant [acted] negligently").

*Maddox v. City of New York*, 66 N.Y.2d 270, 278 (1985)). Awareness of the risk is not to be determined in a vacuum; instead, it is to be assessed against the background of the skill and experience of the particular plaintiff, and in that assessment a higher degree of awareness will be imputed to a professional than to one with less than professional experience in the particular activity. *Maddox*, 66 N.Y.2d at 278; *Goodlett*, 223 F.3d at 36 (collecting cases).

Here, it is undisputed that the parties were engaging in a sport or recreational activity. DE 25-4 ¶¶ 46, 50. And as discussed above, there is no evidence of reckless conduct or intentionally harmful conduct. Importantly, "intentional" in this context does not mean *any* intentional conduct by defendant but rather an act to intentionally cause harm. *See Turcotte*, 68 N.Y.2d at 437 (finding that the defendant owed "no more than a duty to avoid reckless or intentionally harmful conduct"). Plaintiff has not even alleged that defendant intentionally harmed him that day. Thus, the question is whether plaintiff had assumed the risks inherent with hand propping the Bird.

In *Goodlett*, the Second Circuit analyzed whether a pilot who was killed in a midair collision immediately after completion of an airplane race assumed the risk of that fatal crash. 223 F.3d at 34. The court held that the pilot did assume the risk, reasoning that he flew airplanes for 23 years, worked as a commercial pilot and flight instructor, previously participated in numerous airplane races, and served as president of an association that sponsors air races and cautions pilots about the potential for injury or death. *Id.* at 37-38. The court determined that the dangers of airplane racing were both "fully comprehended" and "perfectly obvious" to the pilot and, as such, relieved the defendant of owing any legal duty to him. *Id.* at 38 (quoting *Turcotte,* 68 N.Y.2d at 439).

Similarly here, the undisputed facts establish that plaintiff "was obviously aware of the risks involved" in hand propping the Bird. *See id.* at 38. Plaintiff admits that "[a]t the time of the

15

accident, [he] was aware of the risk of injury posed by hand-propping aircraft and the risk of injury posed by hand-propping the 'Bird' aircraft." DE 25-4 ¶ 38. To be sure, plaintiff has approximately 65 years' experience in maintaining and repairing aircraft; worked as a commercial and private pilot; helped install the new engine in the Bird; hand propped the Bird around 100 times; and hand propped his own vintage aircraft around 500 times. Remarkably, plaintiff *returned* to hand propping aircraft even after the accident. DE 25-1, Ex. 2 at 88:3-7. Therefore, the dangers of hand propping the Bird were both "fully comprehended" and "perfectly obvious" to plaintiff. *See Goodlett*, 223 F.3d at 38.

Therefore, the Court finds that even if plaintiff could establish a negligence claim, the assumption of risk doctrine would bar recovery as a matter of law.

*Strict Liability*

Concerning strict liability claims for abnormally dangerous or ultrahazardous activities, New York courts have adopted the six factors enumerated in the Restatement (Second) of Torts § 520. *In re Brookhaven Nat'l Lab'y Trichloroethylene Cases*, 511 F. Supp. 3d 374, 392 (E.D.N.Y. 2020) (citing *Doundoulakis v. Town of Hempstead*, 42 N.Y.2d 440 (1997)). These factors are as follows:

1. Existence of a high degree of risk of some harm to the person, land or chattels of others;

2. Likelihood that the harm that results from it will be great;

3. Inability to eliminate the risk by the exercise of reasonable care;

4. Extent to which the activity is not a matter of common usage;

5. Inappropriateness of the activity to the place where it is carried on;

6. Extent to which its value to the community is outweighed by its dangerous attributes.

*Id.* (citation omitted).

16

These factors, however, are not the extent of the rule. Section 520 "deals only with the factors," whereas section 519 addresses the general principle of strict liability for abnormally dangerous activities and Sections 521-524A address important limitations. Restatement (Second) of Torts § 520 cmt. a. (2021). Indeed, the "general rule stated in [§ 519] is subject to exceptions and qualifications, too numerous to be included within a single Section. It should therefore *be read together with § 520 to 524A*, by which it is limited." *Id.* § 519 cmt. a. (emphasis added).

Under § 523, a plaintiff's "assumption of the risk of harm from an abnormally dangerous activity bars his recovery for the harm." *Id.* § 523. A plaintiff assumes the risk when he knows that there is an abnormal risk of serious harm, to which those who take part in the activity or come within its range will be subjected. *Id.* § 523 cmt. c (citation omitted). Indeed, the risk is commonly assumed by one who takes part in the activity himself or when knowing that the activity is being carried on and aware of the risk that it involves, voluntarily proceeds to encounter the risk by coming within range of it. *Id.* cmt. d, e. For example, "a plaintiff who accepts employment driving a tank truck full of nitroglycerin, with knowledge of the danger must be taken to assume the risk when he is injured by an explosion." *Id.* cmt. d.

Here, even assuming that plaintiff could establish that hand propping vintage aircraft is abnormally dangerous activity, plaintiff unquestionably assumed the risk when he hand propped the Bird. Plaintiff voluntarily and unilaterally stepped up to the Bird's propellor, directing Nick to step aside.

Therefore, even assuming, *arguendo*, plaintiff could establish a strict liability claim under § 520, it would be barred as a matter of law pursuant to the assumption of risk doctrine set forth in § 523.

*New York General Business Law Section 251*

Under New York General Business Law ("NY GBL") § 251,[8] an aircraft owner is liable when someone, with the owner's permission, causes death or injuries as a result of the use or operation of the aircraft, *in any case where the person using or operating the aircraft, or his estate, would be liable for such death or injuries*. N.Y. GEN. BUS. LAW § 251 (emphasis added). In other words, the statute provides that an aircraft owner may be vicariously liable for the negligence of the operator of the airplane. *See In re Air Crash*, 2012 WL 1029505, at *7. So, for an aircraft owner to be held liable under Section 251, there must first be liability imposed against the operator of the aircraft. *See Hernandez-Galindo v. Marc-Reid Enterprises, Inc.*, 898 F. Supp. 87, 88 (E.D.N.Y. 1995) (acknowledging that § 251 provides a basis for those injured by a pilot's negligence to recover damages from the owner of the plane).

Here, plaintiff cannot show that a genuine issue of material fact exists as to this claim because plaintiff cannot show the prerequisite liability. Since plaintiff cannot establish that defendant, as operator of the Bird, is liable for plaintiff's injuries, then plaintiff cannot show that defendant, as owner of the Bird, is liable under Section 251. Therefore, plaintiff's claim under NY GBL § 251 fails as a matter of law.

In any event, plaintiff has failed to address this argument in his opposition to summary judgment and, as such, his argument, if any, has been waived. *See Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004).

### *Conclusion*

For the reasons set forth above, defendant's motion for summary judgment is GRANTED in its entirety. The Clerk of Court is respectfully directed to enter judgment for defendant and close the case.

---

[8] We assume, for these purposes, that plaintiff's NY GBL claim is not preempted.

**SO ORDERED.**

Dated: Central Islip, New York
      June 6, 2023

                                          <u>/s/ Gary R. Brown</u>
                                          GARY R. BROWN
                                          United States District Judge